UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRISTER M., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20-cv-02426-SEB-TAB |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner of ) | |
| Social Security Administration ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION ON COMPLAINT FOR JUDICIAL REVIEW**

**A.   Introduction**

Plaintiff alleges he has been disabled since February 10, 2016, based upon a variety of medical conditions that include sleep apnea, respiratory problems, obesity, and heart disease. The Administrative Law Judge who conducted a hearing on this matter saw things differently, concluding that Plaintiff could perform his past relevant work as a gluer as well as a significant number of other jobs in the national economy.  Plaintiff argues the ALJ's decision is "flawed" and accuses the Commissioner of "attempting to lull the court into ignoring its obligation to remand in the face of legal error."  [Filing No. 16, at EFC p. 1, 3.]

Contrary to Plaintiff's allegations, the Commissioner is attempting no such thing.  Rather, the Commissioner's brief thoroughly and appropriately demonstrates the ALJ's decision should be affirmed.  While Plaintiff's briefs are replete with generalized legal citations, overall Plaintiff fails to specifically address where the ALJ allegedly went astray.  [Filing Nos. 13, 16.]  It is not enough that Plaintiff disagrees with the ALJ's decision; Plaintiff must show that the ALJ's decision is not supported by substantial evidence.  Plaintiff has failed to do so, and therefore the ALJ's decision should be affirmed.

**B.    Discussion**

Plaintiff was 35 years old on February 10, 2016, the date he contends he became disabled. Plaintiff's opening brief contends his disability was due to problems with congestive heart failure, high blood pressure, sleep apnea, asthma, and depression. [Filing No. 13, at ECF p. 2.] However, as the Commissioner points out in response, Plaintiff's arguments mainly pertain to his respiratory and sleep apnea problems. [Filing No. 15, at ECF p. 2.] As a result, the Commissioner's response indicates the Commissioner would focus only on the medical records that relate to these conditions. Plaintiff's reply brief did not take issue with this approach [Filing No, 16], so the Court likewise narrows its focus.

On January 2, 2018, Plaintiff presented for a consultative examination with Dr. Elrod. [Filing No. 10-7, at ECF p. 199.] On examination, Plaintiff's lung fields were clear to auscultation and percussion, with no wheezes, crackles, rales, or rhonchi. A pulmonary function test indicated a probable restriction after bronchodilator treatment. Although the test results indicated Plaintiff exerted maximal effort, the results also stated there was poor session quality and that the test results were not reproducible and had to be interpreted with care. [Filing No. 10-7, at ECF p. 203-04.]

On January 16, 2018, Plaintiff presented to Eskenazi Hospital complaining of two weeks of shortness of breath and cough. [Filing No. 10-8, at ECF p. 234.] Plaintiff was hospitalized for five days and was in critical care requiring intensive care management. This included placing Plaintiff on a BiPAP machine.[1] On discharge, Plaintiff's lungs were clear to auscultation

---

[1] As set forth in Plaintiff's medical records, Plaintiff was prescribed both a CPAP and a BiPAP machine. [Filing No. 10-8, at ECF p. 51, 215.] For a discussion of the similarities and differences of these machines see www.sleepfoundation.org (last visited August 31, 2001). As explained on this site, CPAP machines are a more common treatment for sleep apnea, and provide continuous positive airway pressure, whereas BiPAP machines provide bi-level posture

bilaterally, his breathing was nonlabored, and he had good air movement. [Filing No. 10-8, at ECF p. 46.] While Plaintiff's breathing improved during his hospitalization, his obstructive sleep apnea was deemed uncontrolled, and he required close follow-up.

In April 2018, Plaintiff saw Dr. Manchanda to review the results of a sleep study. [Filing No. 10-8, at ECF p. 215.] Overall Plaintiff's health was improved using the CPAP machine, though he used it only intermittently. Plaintiff's lungs were clear to auscultation bilaterally with audible breathing. The doctor noted that Plaintiff was only using the CPAP machine 52% of the time and that as a result he was non-compliant with treatment. [Filing No. 10-8, at ECF p. 216.] After changing to a BiPAP machine, Plaintiff reported his daytime sleepiness improved compared to when he was on a CPAP. [Filing No. 10-9, at ECF p. 15.] He reported using his machine every night the entire time he was sleeping. He was having a significant air leak in his mask, so it was recommended he would benefit from a mask refit and his pressure was changed. Plaintiff also was making positive efforts in lifestyle changes to lose weight.

Nurse Practitioner Sharon Riesner, Plaintiff's primary care provider of four years, completed a sleep disorder Residual Functional Capacity questionnaire in March 2019. [Filing No. 10-8, at ECF p. 232.] Riesner noted Plaintiff was unable to stay awake while sitting during her exams, and she had to awaken him each time she entered the exam room. Riesner further noted that since Plaintiff had started on the correct CPAP setting, he improved dramatically though he was suffering from depression. Riesner stated that Plaintiff should avoid work involving climbing and heights; avoid power machines, moving machinery, or other hazardous conditions; and could lift/carry 20 pounds on an occasional basis. Riesner said Plaintiff was

---

airway pressure. CPAP machines may be portable, whereas BiPAP machines are designed for at-home use, require additional sensors and settings, and are usually twice the cost of a similar CPAP machine.

likely to be absent from work less than once a month as a result of his impairment. He should avoid chemical and gas fumes due to his asthma, and he should avoid heavy lifting due to an umbilical hernia. [Filing No. 10-8, at ECF p. 234.]

Plaintiff's application for disability was denied initially and upon reconsideration. On July 9, 2019, the ALJ held a hearing at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. The ALJ determined that Plaintiff had the following severe impairments: obesity, obstructive sleep apnea, asthma, and a hernia. [Filing No. 10-2, at ECF p.19.] Next, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listed impairment. The ALJ assessed Plaintiff with the ability to do light work, which the regulations define as lifting up to 20 pounds occasionally and up to 10 pounds frequently. The ALJ also assessed Plaintiff with the following additional limitations: 1) no work around unprotected heights, open flames, or unprotected dangerous machinery, 2) cannot climb ladders, ropes, or scaffolds, and 3) no concentrated exposure to dusts, gases, odors, fumes, poor ventilation, or the extremes of cold, heat, or humidity. [Filing No. 10-2, at ECF p. 23-24]. Relying on the vocational expert's testimony, the ALJ determined that Plaintiff could return to his past relevant work as a gluer, as well as perform a significant number of other jobs in the national economy. Therefore, the ALJ concluded that Plaintiff was not disabled. [Filing No. 10-2, at ECF p. 32.]

The issue before the Court is whether the ALJ's factual findings are supported by substantial evidence. *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir. 1998). In addition, "the ALJ must articulate at some minimal level his analysis of the evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (internal citation and quotation marks omitted). In so doing, the ALJ must build an accurate and logical bridge between the evidence and the result. *Sarchet v.*

*Chater*, 78 F.3d 305, 307 (7th Cir. 1996). With this standard of review in mind, the Court examines the ALJ's decision and Plaintiff's challenges.

Plaintiff claims that the ALJ improperly evaluated his impairments because the January 2018 pulmonary function test established that he met Listing 3.03, as well as Listing 3.02. The magistrate judge disagrees. The ALJ appropriately found that the sole pulmonary function test in the record fails to establish that Plaintiff's impairments meet the listing requirements. For the testing to be considered valid, a claimant must be medically stable when the test is conducted. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 3.00E(2)(a). A claimant is not stable if he is experiencing or is within 30 days of completion for treatment of an acute exacerbation of a chronic respiratory disorder. As the ALJ found, two weeks after the test, Plaintiff was in the hospital for five days for respiratory failure. [Filing No. 10-8, at ECF p. 45-46.] On admission, Plaintiff complained of shortness of breath for two weeks. As such, his condition was not stable when the pulmonary function test was performed and the ALJ properly discounted it.[2]

The ALJ also properly considered any factor that could affect the interpretation of Plaintiff's pulmonary function test results. The technician who evaluated the testing stated that there was "Poor session quality, Interpret with care." [Filing No. 10-8, at ECF p. 38.] Moreover, the technician determined that the test results were not reproducible due to the values differing by more than 5% or .1L. Even though the technician stated that Plaintiff provided good effort, questions about the reliability of the test results remained—results that did not meet the regulation's validity criterion. Plaintiff argues that the ALJ impermissibly played doctor by

---

[2] Plaintiff accuses the Commissioner of engaging in post-hoc rationalization of the ALJ's decision. [Filing No. 16, at ECF p. 2.] While it is true that the ALJ did not expressly reference this regulation, the ALJ did reference Plaintiff's January 16-22 hospital stay and the fact that Plaintiff's pulmonary function test on January 2, 2018, occurred just two weeks before Plaintiff's hospital admission for respiratory failure. [Filing No. 10-2, at ECF p. 23.]

interpreting Plaintiff's pulmonary test results. [Filing No. 13, at ECF p. 16.] The magistrate judge disagrees. The ALJ's rationale for finding that Plaintiff did not meet the listing was based on the technician's interpretation of the test data, not the ALJ's.

The magistrate judge also rejects Plaintiff's argument that the January 2018 pulmonary function test establishes that Plaintiff's condition met Listing 3.02. As discussed above, the testing fails to meet the validity requirements to show Plaintiff met Listing 3.03, so Plaintiff likewise cannot meet the requirements of Listing 3.02. And as for Listing 3.14, the magistrate judge agrees with the Commissioner that Plaintiff fails to point to any evidence that demonstrates that he met the requirements of this listing or shows any error by the ALJ in analyzing the listing. Given that Listing 3.14 requires noninvasive ventilation with BiPAP twice within a 12-month period, it is inapplicable.

Plaintiff next argues that, given the ALJ had concerns with the pulmonary function test, he should have ordered another test. While an ALJ has the duty to develop a full and fair record, an ALJ likewise may assume that a claimant represented by an attorney is making his "strongest case for benefits." *Wilkins v. Barnhart*, 69 F. App'x. 775, 781 (7th Cir. 2003). As previously noted, Plaintiff was represented by counsel at the hearing, and his counsel did not request additional testing or allege that the record was incomplete. Moreover, the ALJ left the record open for additional cardiology and pulmonary records, and Plaintiff's counsel did not object to the record. [Filing No. 10-2, at ECF p. 40-41, 72.] In short, Plaintiff failed to meet his burden of presenting evidence that establishes he is disabled.

Plaintiff next argues that the ALJ failed to properly evaluate his subjective complaints. However, a review of the ALJ's decision reveals otherwise. After reviewing the evidence, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected

6

to produce his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record.  [Filing No. 10-2, at ECF p. 24.]  Specifically, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the record that documented that his sleep apnea improved dramatically once he started using the BiPAP machine, and that his daytime sleepiness decreased.  The ALJ also found that Plaintiff's asthma was controlled once he became compliant with medication.  The ALJ further noted that Plaintiff was able to lose weight with a change in diet and exercise, which supported a finding that he could perform light work with additional limitations.  [Filing No. 10-2, at ECF p. 24.]

       Plaintiff argues that the ALJ erred in that just because Plaintiff reported improvement in his symptoms after starting BiPAP does not mean he is capable of performing light work.  [Filing No. 13, at ECF p. 21-22.]  This argument unfairly shortchanges the ALJ's analysis.  The ALJ compared Plaintiff's allegations against the objective evidence.  The ALJ noted that Plaintiff's primary complaints related to his daytime sleepiness, but during the period slightly before and slightly after the relevant period, the record documents his poor compliance with using the CPAP machine and taking his medication.  The ALJ observed that Plaintiff's condition did not immediately improve after his January 2018 BiPAP treatment, given he could not pick up his medications for financial reasons.  [Filing No. 10-2, at ECF p. 25.]  The ALJ went on to find, however, that Plaintiff was not compliant with his CPAP treatment because as of March 28, 2018, he had only used his mask 52% of the time.  The ALJ further concluded that while Plaintiff was diagnosed with a hernia in early 2018, there was no treatment despite his meetings

7

with surgeons on multiple occasions and his scheduling of surgical intervention. [Filing No. 10-2, at ECF p. 26-27.]

Moreover, while Plaintiff testified that he was not comfortable working because of excessive daytime sleepiness, the ALJ found that after Plaintiff started using his BiPAP mask in April 2018, his daytime sleepiness markedly improved. The ALJ also found that prior to switching to the BiPAP machine, Plaintiff had been extremely noncompliant with wearing a mask and taking his medication. Yet even during periods of noncompliance, Plaintiff was able to perform substantial gainful activity. In addition, the ALJ also observed that subsequent to Plaintiff's hospitalization in January 2018, his condition improved and he lost more than 30 pounds by improving his diet and exercising with his wife. As the ALJ expressly stated, "This is in contrast to his testimony that he has not been exercising at all." [Filing No. 10-2, at ECF p. 28.] Thus, substantial evidence supports the ALJ's conclusion that Plaintiff's allegations "are inconsistent with the objective evidence in the file." [Filing No. 10-2, at ECF p. 28.] And there is more. The ALJ determined that while Plaintiff testified that he had to elevate his legs twice a day for 30 minutes each to relieve foot pain, there was no documentation in the record that Plaintiff had been urged to elevate his feet to prevent edema. Instead, Plaintiff had been urged to limit his salt intake. The ALJ noted in the same discussion that one of the most recent instances of edema involved Plaintiff's hands, which would not be remedied by elevating his legs. [Filing No. 10-8, at ECF p. 28.] Moreover, there was no lower extremity edema on examination in April 2019, when he presented with complaints of chest pain. [Filing No. 10-2, at ECF p. 28; Filing No. 10-9, at ECF p.50.]

Contrary to Plaintiff's suggestion, the ALJ did not explicitly tie Plaintiff's improved daytime sleepiness to his ability to do light work. Instead, the ALJ appropriately compared

8

Plaintiff's allegations to the evidence in the record and found support for Plaintiff's claims to be lacking. The conclusion is supported by the fact that Plaintiff's condition had improved. Specifically, Plaintiff's August 2018 medical record noted that with the BiPAP machine, his daytime sleepiness was markedly improved. [Filing No. 10-9, at ECF p. 15.] Plaintiff is correct to point out that Plaintiff also reported shortness of breath, especially with exertion, and that the Indiana Family and Social Services Administration determined Plaintiff to be medically frail. [Filing No. 13, at ECF p. 22.] However, given that Plaintiff filed his applications in October 2017, his claim was evaluated under the new regulations concerning how the agency considers evidence. Under these new regulations, determinations by other government agencies are inherently neither persuasive nor valuable, and as such, the ALJ had no obligation to explain how he considered such evidence. As such, Plaintiff's accusation that the ALJ was improperly cherry picking the evidence rings hollow. [Filing No. 13, at ECF p. 22.] Similarly, the ALJ was not required to discuss each factor listed in Social Security Ruling 16.3p in his decision. *Tilley v. Colvin*, No. 1:13-cv-1775, 2015 WL 926178, at *5 (S.D. Ind. Mar. 3, 2015) ("It is not necessary that the ALJ recite findings on every factor described in SSR 96–7p, or that he discuss every piece of evidence that might bear on credibility, or that he even specify exactly which of the claimant's statements were not credible.") (internal citations omitted).

      Finally, the ALJ explained that he found persuasive Nurse Practitioner Riesner's opinion regarding Plaintiff's physical conditions. [Filing No. 10-2, at ECF p. 29.] The ALJ specifically noted Riesner was Plaintiff's primary care provider and that he had been seeing her since 2015. [*Id*.] The ALJ then went on to state the basis for his findings about Plaintiff's functional limitations at various points within the decision. For example, the Plaintiff's continued ability to exercise supported his ability to perform light work. The ALJ further found that while Plaintiff

should not engage in heavy lifting unless he had surgical intervention, his claim that he was limited to lifting 10 pounds was unsupported given that Riesner limited him to no more that 20 pounds. As the foregoing demonstrates, the ALJ adequately discussed the record evidence, including the evidence from Plaintiff's primary care physician. This evidence supports the ALJ's findings.

**C.     Conclusion**

For the reasons set forth above, the ALJ's decision was not flawed or otherwise erroneous. On the contrary, substantial evidence supports the ALJ's decision that Plaintiff could perform his past relevant work as a gluer, in addition to other jobs. Accordingly, Plaintiff's request for remand [Filing No. 13] should be the ALJ's decision should be affirmed.

Any objection to the magistrate judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure to file timely objections within 14 days shall constitute waiver of subsequent review absent a showing of good cause for such failure.

Date: 9/8/2021   _____

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email